CARSON et al. v. HURT.

(Circuit Court of Appeals, Fifth Circuit. March 16, 1918.)

No. 3126.

1. MORTGAGES ⬷310—PARTIAL RELEASE—INTEREST.
    Where a vendor took a deed of trust for the unpaid purchase money, which provided that the purchaser, his heirs or assigns, might obtain the release of portions of the land upon payment of the amount due thereon as prorated, the grantees of the purchaser, who delayed in demanding releases, are liable for the interest accruing during the period of delay, and cannot obtain releases on payment merely of the amount originally due.

2. MORTGAGES ⬷310—PARTIAL RELEASE.
    In the absence of any provision to the contrary, a mortgagee can gratuitously release any of the land mortgaged without impairing his right to enforce the mortgage against land not released; hence, where a deed of trust for unpaid purchase money provided for the release of portions on payment of the amount due thereon as prorated, the fact that the vendor released some portions of the land on different terms does not deprive him of the right to demand the full amount due on other parcels.

3. MORTGAGES ⬷581(2)—FORECLOSURE—ATTORNEY'S FEES.
    Where notes for unpaid purchase money due on land and secured by a deed of trust provided for the payment of an attorney's fee, if placed in the hands of an attorney or collected by suit, grantees of the purchaser, who made no tender before foreclosure suit of the amounts which they were required to pay to secure the release of their lands under the trust deed, are liable for the attorney's fee provided.

4. APPEAL AND ERROR ⬷907(4)—REVIEW—PRESUMPTION—EVIDENCE.
    Where the court did not approve the statement of the evidence found in the record, as required by equity rule 75 (198 Fed. xl, 115 C. C. A. xl), but it is certified by counsel to be correct, but it does not show that all evidence or substance thereof is therein contained, it is to be presumed that the court's findings were supported by evidence other than that which the record disclosed, though counsel had approved the statement of the evidence as correct.

5. APPEAL AND ERROR ⬷1073(1)—REVERSAL—COMPLETE DETERMINATION.
    Where three of the defendants to a suit to foreclose a deed of trust filed a cross-bill to remove a cloud from their title, and the sole defendant to such cross-bill disclaimed any interest and consented to the entry of any decree desired, the failure of the court to dispose of the cross-bill, which did not appear to have been called to its attention, does not warrant reversal of a decree of foreclosure.

6. MORTGAGES ⬷579—FORECLOSURE—DECREE—MODIFICATION ON APPEAL.
    Where a vendor, who took back a deed of trust for the unpaid purchase price, providing that the purchaser or his heirs or assigns might obtain releases for any parcels not less than 640 acres upon payment of the amount due thereon as prorated, foreclosed the deed of trust against unreleased lands, which had been disposed of, a modification of the decree on appeal, consented to by the vendor, so as to permit each defendant, by paying a sum bearing the same porportion to the amount decreed that his land might bear to the larger parcel foreclosed, to prevent the sale of his land, is proper.

    Batts, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Northern District of Texas; Edward R. Meek, Judge.

⬷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Bill by William Hurt against John Carson and others. From a decree for complainant, defendants appeal. Modified and affirmed.

Burt J. Thompson and Alan Loth, both of Forest City, Iowa, and F. M. Ryburn and S. H. Madden, both of Amarillo, Tex., for appellants.

Ben H. Stone, of Amarillo, Tex., for appellee.

Before WALKER and BATTS, Circuit Judges, and FOSTER, District Judge.

WALKER, Circuit Judge. By a deed bearing date December 3, 1906, the appellee, William Hurt, sold and conveyed to W. H. Garrett 85,844.95 acres of land in Texas at the price of $343,379.80, of which $50,000 was paid in cash, $106,058.80 was to be paid to the holders of a lien on all the land, to which appellee's title was subordinate, the debt secured by that lien being assumed by appellee's vendee, and $181,321, evidenced by the vendee's 10 notes, was secured by a vendor's lien and by the vendee's deed of trust covering the land sold. This was a suit by Hurt to foreclose the liens in his favor on the part of the land covered thereby which had not been released before the suit was brought. Twelve defendants, each of whom acquired part of the unreleased land with constructive notice of the above-mentioned liens, appeal from a decree in favor of Hurt, which adjudged $78,935.23 to be the amount due to him on the purchase-money notes, and decreed the foreclosure and sale of the unreleased land.

[1] The deed of trust to the appellee contained the following provision:

"This conveyance in trust is made with the express agreement and understanding that a full release of this trust, as well as a full release of the vendor's lien, will be executed and delivered to the said W. H. Garrett, his heirs or assigns, as to any quantity or parcel of land embraced in this conveyance not less than 640 acres upon payment of such part of the entire unpaid purchase money as is prorated, owing and unpaid on the land for which such release may be demanded."

An evident purpose of this provision was to enable the purchaser, or any one who might succeed him in ownership, to subdivide the land and sell parcels of it freed of the liens on the whole. The language of the provision gave notice to any subsequent purchaser of a part of the land that the existence of the right to have such part released from the liens on the whole was dependent upon the payment of a pro rata part of the entire unpaid purchase money, including as well what was payable to the appellee's lien creditors as what was payable to himself. When the appellants made their several purchases, not long after the appellee's sale and conveyance, they had constructive notice of what was required to be done to clear the land they bought of the liens covering that and other land. No one of the appellants undertook to comply with the provision quoted until years after his purchase was made. That provision may be regarded as an offer by the appellee to subsequent purchasers of subdivisions of not less than 640 acres of the tract sold to release such subdivisions from the liens in favor of the appellee upon the payment to him of a pro rata part of the entire purchase money owing and unpaid. Evidently it was contemplated that the privi-

lege was to be exercised when the subdivisions should be sold and conveyed. Delay in the exercise of the privilege was likely to, and did, mean delay in the payment of part of the purchase price contracted for by the appellee. In so far as the appellee sustained loss by that delay, he should be compensated for it. The allowance of interest is the appropriate method of compensating for unwarranted delay in the payment of money. Appellants would escape the duty of doing equity if the provision in question is given the effect of entitling them to get their lands released now upon the payment of the same amounts they would have had to pay, if they had exercised the privilege accorded them when they made their purchases 10 years ago. As the result of payments on the purchase price made by others, the amount decreed in appellee's favor is less than the aggregate of what was required to obtain releases of the subdivisions foreclosed when the right to do so accrued, with interest added from the dates of the accrual of that right to the several purchasers of such subdivisions. It is not made to appear that the appellee, by contract, estoppel, or otherwise, has lost the right to have the above-quoted provision of the deed of trust complied with by a subsequent purchaser of part of the tract sold, who seeks to get a release of his land from the liens securing the purchase price of the entire tract of which his land was a part.

[2] But for the above-quoted provision, there could be no question as to the appellee's right to enforce his deed of trust, for the entire amount remaining due on the debt secured by it, against the whole or any part of the unreleased land. In the absence of such a provision, a mortgagee could gratuitously release any of the land covered by the mortgage without affecting or impairing his right to enforce the mortgage against the part of the mortgaged land which was not released. It is suggested that the provision mentioned had the effect, not only of entitling the grantor in the deed of trust or subsequent purchasers of parts of the land embraced in it to have such parts released upon paying proportional parts of the whole purchase price of the incumbered land, but also of entitling a subsequent purchaser of part of the land to have the land he purchased released without complying with the conditions expressed in the deed of trust, if the appellee has released parts of the land purchased by others without exacting compliance by them with the conditions on which they were entitled to releases. We are not of opinion that such effect properly can be given to the provision in question. It does not purport to put any restriction or limitation on the right of the appellee to release part of the land, gratuitously if he chooses, without affecting or impairing the right which the deed of trust gives him against the remainder of the land embraced by it. The provision granted the privilege of obtaining partial releases on stated terms. It did not purport to affect the appellee's right to give releases on different terms. The appellants were not prejudiced by purchasers of other parts of the mortgaged land getting releases for nothing, or for less than the mortgagee was entitled to exact. That did not add to the amounts they were required to pay to get their lands released. They have nothing to complain of so long as they are permitted to get their lands released on the terms stated in the deed of

trust. Under the decree appealed from they had the benefit of all payments that had been made on the purchase price of the land embraced in the deed of trust. They will get all to which they are entitled under the above-quoted provision, if they are allowed to secure the release of their land upon payment of proportional parts of the entire purchase price still owing and unpaid. We are not of opinion that appellee's acts in releasing other subdivisions from his liens had the effect of a release of the subdivisions bought by the appellants, or of giving to the latter the right to have their subdivisions released, not on the terms prescribed by the deed of trust, but on the terms on which the appellee, without being bound to do so, released other subdivisions.

[3] The notes secured by the foreclosed deed of trust provide for the payment of an attorney's fee of 10 per cent., if placed in the hands of an attorney or collected by suit. The only tender made by any of the appellants before the suit was brought was of less than he was required to pay to be entitled to a release of his land. This being so, appellee had the right to bring suit for the foreclosure of his liens, and to make the appellants defendants to that suit. The costs and attorney's fees to which he is entitled are chargeable against any unreleased land against which he was justified in enforcing his liens by suit. The lands of the appellants were in that category. The appellants had not, before the suit was brought, done that which would make appellee's enforcement of his lien by suit wrongful or unjustifiable as to them. Appellee did nothing that can be given the effect of forfeiting his contract right to be allowed an attorney's fee. The appellants are not entitled to be relieved of their proportionate part of the expense, including the attorney's fee stipulated for, of the suit, the institution of which against them was justified by their defaults.

[4] It is not so clearly made to appear by the record that the amount of the secured debt found to be due was more than was actually due as to justify the setting aside of the finding of the trial court. The record contains a statement of evidence adduced by the opposing parties, which their respective counsel certified was "examined and found correct." This statement was not approved by the court or judge, pursuant to equity rule 75 (198 Fed. xl, 115 C. C. A. xl). Nothing in it shows that it contained all, or the substance of all, the evidence adduced. The contrary not appearing, it is to be presumed that the court's findings were supported by evidence other than that which the record on appeal discloses. Furthermore, even on the evidence which is set out, it does not seem to be permissible to make the appellee's book entries conclusive against him. The payments on the secured debt were made by or through the O. W. Kerr Company, the seller of the land in parcels. It was to the interest of that company to get the benefit of all payments made. A statement made by it not long before the suit was brought indicated that more was unpaid on the secured debt than the amount found to be due.

[5] The assignments of error made by the 12 appellants are joint and not several. One of those assignments complains of the failure of the court to decree on what was called a cross-bill filed by 3 of the appellants. The sole party defendant to that so-called cross-bill was

the First International Bank of South Bend, Wash. That bank filed an answer disclaiming any interest in the land, an alleged cloud on the title to which created by a mortgage to it was sought to be removed, and consenting for the court to enter any decree desired by the three parties who filed the cross-bill, provided costs were not taxed against it. The record does not indicate that the cross-bill was thereafter called to the attention of the court, or a decree on it sought. Some of the appellants who join in the assignments of error are without any interest in the fate of that collateral proceeding. It is not made to appear that the institution and pendency of that proceeding were even brought to the notice of the appellee, or that he resisted, or was interested in resisting, the granting of the relief it sought. It seems that the answer filed by the only party defendant to that proceeding was by itself enough to dissipate the alleged cloud complained of. In the circumstances stated, the decree appealed from is not to be reversed because of the court's failure to make disposition of the cross-bill.

[6] The conclusion is that the decree appealed from would not deprive the appellants of any right to which they are entitled, if it is so modified as to permit each of them to prevent the ordered sale of his land by paying his proportionate part of the amount decreed in favor of the appellee, including costs, the amounts to be paid by the several appellants to be in the same ratio to the whole amount decreed that the several tracts bought by them bear in acreage to the larger tract foreclosed and decreed to be sold. Whatever right the appellants and others in like situation have under the above-quoted provision of the deed of trust to have land embraced therein released is a derivative one, resulting from their occupying the status of assigns of the grantor in that instrument. If that grantor had not conveyed to others the lands still unreleased, his privilege of having part of that land released would have been conditioned upon his "payment of such part of the entire unpaid purchase money as is prorated, owing and unpaid on the land for which such release may be demanded." He would not have been entitled to such an allotment of less than pro rata parts of the unpaid purchase money against the several subdivisions of not less than 640 acres each as would result in leaving a part of it unsecured by the land remaining subject to the deed of trust. His assigns, as a class or separately, have not acquired a privilege of having their lands released on such terms as would lead to the result just mentioned. In the argument of the case in this court the counsel for the appellee expressed a willingness for the above-indicated modification of the decree to be made. Such modification is accordingly ordered, with direction that the amount required to be paid by each appellant to secure a release of his land be ascertained and stated, and 30 days thereafter allowed to the several appellants to pay such amounts into the registry of the court. Subject to compliance with this order, the decree is affirmed, with costs against appellants.

Modified and affirmed.

BATTS, Circuit Judge (dissenting). I regret that I cannot entirely concur in the conclusion reached by my Brethren. William Hurt, ap-

pellee, hereinafter called plaintiff, on December 1, 1906, sold to W. H. Garrett, by warranty deed, 85,844.95 acres of land in Bailey county, Tex. Subsequently the title was placed in W. H. Sulflow, and the business of selling the land was conducted in the names of two corporations, the O. W. Kerr Company and the Texas & Southwestern Colonization Company. These parties will be called the purchasers. The land, or most of it, was sold in smaller tracts in 1907, and the purchasers of these tracts will be called the subpurchasers. The recited considerations of the sale to Garrett were as follows: (1) The assumption by Garrett of notes due by Hurt to his vendor, to the amount of $106,058.80; (2) the payment of $50,000 cash; (3) the payment of notes aggregating $187,321. This deed provided for a lien to secure the purchase price. Contemporaneously with the execution of the deed, a deed of trust was executed which specifically referred to and expressed a lien on the land to secure the payment of the notes last mentioned. In the deed of trust was the following provision:

"This conveyance in trust is made with the express agreement and understanding that a full release of this trust, as well as a full release of the vendor's lien, will be executed and delivered to the said W. H. Garrett, his heirs and assigns, as to any quantity or parcel of land embraced in this conveyance, not less than 640 acres, upon payment of such part of the entire unpaid purchase money as is pro rata owing and unpaid on the land for which such release may be demanded."

In the contract under which Hurt had purchased the land was a like provision. The circumstances under which the sales were made indicate the reason for the provision. It was contemplated that the land should be sold in small tracts, and it was realized that it would be necessary that releases be provided for, in order that a good title might be given to the purchaser. By the terms of the provision, its benefits could be secured by the heirs and assigns of the purchaser.

The appellants insist that the provision quoted fixed on each tract of land sold a definite amount of $2.19 per acre, upon payment of which the purchaser is to have his land released. This contention is upon the assumption that the release is to be had upon payment of the proportionate part of the amount secured by the deed of trust. Taking into consideration the original provision in the deed to Hurt, and the clause in the provision quoted, to the effect that the release is to be had upon payment of such part of the entire unpaid purchase money as is pro rata due upon the particular tract, the conclusion is reached that, primarily, and after payment of the $50,000, the payment to be made to secure a release was, instead of $2.19, $3.41 per acre, or the total purchase price remaining unpaid, divided by the total acreage.

The provision required the payment, in order to secure a release, of such part of the unpaid purchase money "owing and unpaid on the land for which such release may be demanded." It was contemplated, of course, that the land would be paid for in accordance with the terms of the deed and of the notes given as part of the purchase price, and it was contemplated that, to secure a release, the purchaser would be in position to demand the release upon payment of the "pro rata part" remaining unpaid "on the land for which such release may be de-

manded." Whenever, by payment on the part of the vendee (purchaser) under the deed, the amount unpaid was reduced, a new status resulted, and each subpurchaser's "pro rata" on his land was correspondingly reduced. The provision was made for the benefit of each subpurchaser, and, whenever any right arose to him by virtue of any payment made, no action on the part of the vendee (purchaser) from whom he bought, or on the part of the plaintiff, could injuriously affect these rights.

The evidence indicates that releases were made upon such a basis that, if all of the acreage had been released on the same basis, the payments for releases would have been insufficient to have discharged the entire indebtedness. The seller of the land, the plaintiff, had, of course, the right to release any tract that he might choose to release; and if, as was the case, his vendee joined in the request for the release at this inadequate price, both of the parties would be bound by the action, and the release would be in all respects effective. This, not by virtue of the contract, but because the vendor would have a right, notwithstanding the contract, to give away his property if he wanted to. Such a release, however, could not have the effect of placing a subpurchaser in a less favorable position than prior to such release. If, to illustrate, there had been outstanding so much of the unpaid purchase price as would have required a payment of $3 per acre for its discharge, and the plaintiff, at the request of his vendee, had released certain of the lands at $2 per acre, whereby there would be due upon what was left a larger amount than $3 per acre, subpurchasers, whose rights had been fixed prior to that time, would nevertheless have the right, by paying the $3 an acre, to secure releases.

It is insisted by appellants that the course of conduct between the plaintiff and the purchaser in the giving of releases to a number of the subpurchasers at $1.90 and less created a condition which authorized other subpurchasers to secure releases for like amounts. As suggested, the limit of the restriction upon the plaintiff was that he could not execute a release that would injuriously affect persons whose rights had already been fixed. He did not, by taking less than he had a right to demand, do anything that he did not have a right to do. But this action on his part could not take away rights which had already been fixed in other people, nor did it give them new rights. The clause was executed for the purpose of making it practicable for the vendee (purchaser) to resell the land, by making it possible to give good titles to the subpurchaser, without taking up the notes executed for the purchase price before they were due. If a construction is given to it which would authorize the plaintiff, the original vendor, to accept releases for an amount less than he had a right to demand, with the effect of adding this deficit to the amount which subpurchasers subsequently demanding releases would have to pay, the value of the clause would be entirely destroyed.

The actual course of events in this case illustrates, as well as any facts which might be imagined, the effect of such a construction. The evidence shows that releases were accepted as low as $1.63 per acre. At a subsequent date, and at a time when the appellants in this case

were undertaking to secure releases by the payment of a proper release price, the plaintiff wrote: "I can't release the land until I am paid $4 per acre." Subsequently he wrote: "You will have to pay $5 per acre to get releases." At one time Hurt wrote the purchaser that there was $30,929.85 "you are due me without any further releases." In other words, according to his statement, on May 26, 1911, he had executed releases, receiving by $30,929.85 less than he had a right to demand. No complaint can be made against the execution by him of such releases, but to charge the persons whose lands had not been released with an additional $30,929.85, and require its payment, before releases to them would be executed, would be to entirely destroy the rights which the provision under consideration undertook to fix.

The sales to appellant were made in 1907 and early in 1908. Subsequent to these sales their vendors (the purchasers) paid off the notes to Garrett, aggregating $106,058.80, which they had assumed when the land was purchased from Hurt. It is insisted that this payment did not reduce the amount which appellants would have to pay in order to entitle them to releases. It is suggested that the status is the same as if they had contracted to pay a fixed and certain sum before they were entitled to releases, and that they were not entitled, under any circumstances, to have this amount reduced by payments by somebody else. These subpurchasers have warranty deeds from the persons who paid off the notes executed by Hurt, and which they had assumed. The payment of these notes made their obligations to their vendees (the subpurchasers) good pro tanto. If they had paid off all their obligations to Hurt, the warranties of the deeds would have been made good. If they had paid, as they contracted, not only would the amount required for the releases have been reduced, but would have been wiped out entirely. Indeed, the necessity for individual releases would have been eliminated. It could just as well be said that the purchasers (from Hurt) could recover from the subpurchasers amounts paid by them which reduced the amount required to be paid to secure releases for subpurchasers as to suggest that payments made by the purchaser did not have the effect of reducing the amount required to be paid by the subpurchaser for releases. The obligations were the obligations of the purchaser. It was contemplated that they should be paid. It was contemplated that the subpurchaser should make his payments to the purchaser. The release clause was made for the convenience of the purchaser and the safety of the subpurchaser.

Each appellant has already paid to the purchaser a sum largely in excess of that required to pay his proportionate part of all the liens upon the land, including the notes of Hurt, which were assumed, and the notes to Hurt, for a part of which judgment is now rendered. To illustrate: The proportionate part of the original lien chargeable against the section sold to appellant Forkenbrock was $2,176. He has already paid $4,560 on his land, and he is now called upon, in addition, to pay $2,176 and interest and attorney's fees. The money which he paid was used in the discharge of the $106,058.80 lien, but he is not to get any benefit, so far as a release is concerned, from the payment. The appellants in this case were subpurchasers of about 12,000 acres of

land, less than one-seventh of the whole. They have already paid $92,808, more than six-sevenths of the total amount required to take up the assumed notes of Hurt. This lien was discharged, and they ought no longer to be called upon to make payments measured by it. It having been paid, not more than the $187,000 of notes given to Hurt remained unpaid. They had the right to releases by paying their proportionate part of this amount remaining unpaid. It was the obligation of the purchaser to pay the assumed notes. It was the right of the subpurchaser that they be paid. The status created for them by its payment could not be injuriously affected by any person other than themselves.

To further elucidate the views expressed: After the payment of the $50,000 there remained unpaid the notes due to Garrett, $106,-058.80, and the notes due to Hurt, $187,321, a total of $293,379. To have secured a release at that time, the required amount per acre would have been determined by dividing the $293,379 by the total acreage, 85,844, and the result would have been $3.41 per acre. About December 1, 1908, the $106,058.80 was paid. Other payments to that time reduced the debt (according to the auditor whose report was the basis of the judgment) to $129,617. There had been released to this time (according to the list furnished by plaintiff) 35,642 acres, leaving a balance of 50,202 acres. The debt, divided by the acreage, would give as a result 2.58. At that time the subpurchaser would have had to pay, to be entitled to a release, $2.58 per acre. Between December 1, 1908, and December 1, 1912, the debt was reduced $63,102, leaving unpaid $66.515 (auditor's figures). During this period 34,020 acres of the land were released. The persons securing releases, instead of paying $2.58 per acre, paid on an average $1.85 (interest excluded in both cases). After December 1, 1912, in order to secure a release on the balance of the land, 16,182 acres, it would have been necessary to pay $4.16 per acre, the result of dividing $66,515 by 16,182. The increase from $2.58 to $4.16 resulted from giving releases for less than could have been demanded. The interest for the period between December 1, 1908, and December 1, 1912, would have been 24 per cent., and would have increased the $2.58 to $3.20. To the date of the decree, March 5, 1917, 8 years and 3 months, the interest would have increased the $2.58 to $3.85. Appellants, instead of paying $3.85 per acre, are compelled by the decree to pay more than $6 per acre.

Appellants' contention that the amount to be paid by them was to be determined without adding interest to the purchase price is entirely without merit. The interest provided for is a part of the purchase price. While nothing could be done by any one else to injuriously affect their status, and while they were entitled to get the benefit of any payment which the purchaser might have made, if, the amount payable to secure a release having become fixed, the subpurchaser fails then to demand a release, the amount payable necessarily increases with the accruing interest. The evidence indicates that the appellants, before suit was instituted, were undertaking to discharge whatever amounts might be necessary for them to pay in order to secure releases. They made tender of the amounts which they thought due. The plain-

tiff refused to accept it, making demands in excess of what was in fact due. Under the circumstances, it would be inequitable to charge up against the subpurchasers the attorney's fees for which the purchaser became responsible. The conclusion is reached that each one of the appellants should, in order to secure a release, pay such an amount as would now be necessary for him to pay, including interest, if each of the subpurchasers who secured releases had, for such release, paid to the plaintiff the entire amount which the plaintiff could have demanded.

Appellants claim that the amount of the judgment is excessive. The transactions ran over a period of years, and involve many separate payments of money. The court permitted the introduction of a statement made by an auditor, which became the basis for the judgment which was rendered. In addition to this there was introduced the daybook (in the form of a journal) and ledger of the plaintiff. There was also introduced a statement as to releases made by him as a part of an answer to an interrogatory. The daybook and ledger were made by the plaintiff contemporaneously with the transactions from which he received money. He testifies:

"These books, my journal and ledger, are my records as I kept them regarding lands I released. When I would give a release, I would enter it on my daybook here, showing what a man paid, and the section of land and the number of acres, and then I transferred those items into the ledger."

The daybook entries are copied into the record, accompanied by memoranda indicating the differences between the daybook and the ledger. These daybook and ledger entries do not correspond with the result of the auditor's work. It is insisted by appellants that the account books of plaintiff show payments to the amount, exclusive of the payment of the notes assumed by the vendee, of $201,706.89, and they claim that the release statement shows (with items which should be added) payments to the amount of $207,428.73. The amount actually shown by the daybook is $178,685.59. Appellants insist that an item of $21,772.80, dated November 18, 1907, is shown by the daybook. No credit for this amount is given. It is charged up against the owners of the land for releases, but there is no corresponding credit of payment. It is reasonably apparent, from the circumstances and the entries in the books, that, prior to that time, $50,000 having been paid, the release was demanded and made on account of such payment. This item, together with the item of $1,248, under date of May 1, 1914 (which is also charged up, but for which no credit is given), constitute the difference between the amount claimed by appellants to have been paid according to the daybook, and the amount which the daybook in fact showed. The release statement, as introduced in evidence, shows only $116,113.66. This statement is entirely valueless in reaching the amount of money due on the debt. It not only omits the amount of payment in cash primarily made, for which no releases were demanded, but also omits 12 or more items of payments for releases that are indicated by the daybook.

While appellants' insistence that the amount due is either $32,358.61 or $38,070.45 cannot be sustained by the record, a careful examina-

tion of it discloses that the auditor's statement does not include every payment indicated by the books of the plaintiff. Leaving out of consideration the interest items, the auditor gives credit for $5,630.41 less than is shown by the books. A careful checking of the two accounts discloses the items not credited in the auditor's statement. A credit on October 22, 1908, "By draft, $2,416.25," is not in the statement. On May 14, 1912, a credit is given, "By checks and drafts 6/27, paid 8/26, $4,448.00." Of the amounts going to make up this $4,488, the release for one tract, amounting to $1,761.24, is included in the auditor's statement and the balance, $2,727.76, is not. On February 7, 1913, credit is given, "By check, part payment on one-half section 10, Block C, $504.00." This amount is not credited in the statement. These credits in the day book, for which no corresponding credit in the audit statement is made, amount to $5,648.01. The audit statement shows a payment on July 22, 1907, of $17.60, which does not appear in the daybook. Subtracting this, the difference between the amounts which the plaintiff states he has received by the entries in his daybook exceeds the amounts credited in the auditor's statement by $5,630.41. The daybook shows on May 30, 1911, a credit of $15,386.-55. It appears that this was originally $21,000 on the daybook, and it still appears as that sum in the ledger. Appellants insist that the plaintiff should be charged with the $21,000. The correspondence incorporated into the record shows that on May 30, 1911, the date of the entry, Hurt drew a draft, with release attached, for $21,000. Subsequent letters indicate that this draft had not been paid as late as July 7th thereafter. In the absence of additional proof, it will be assumed that the credit of $21,000 was made when the draft was drawn, and that subsequently, the draft not having been paid, the entry in the daybook was changed to correspond.

The court suggests that the statement of evidence was not approved by the District Judge. Counsel for appellee, understanding, doubtless, the conditions by which this was brought about, does not undertake to take advantage of this fact. It is also suggested that the principal debtor acknowledged a greater indebtedness than that found due. Such an acknowledgment is apparently in conflict with the facts, and ought not to bind the other defendants.

The defendants John Carson, T. E. Jensen, and E. C. Shoemaker impleaded the First International Bank of South Bend, Wash., reciting that they had purchased certain of the lands in controversy, and that these lands had been conveyed to M. J. Johnson, as trustee for themselves, that said Johnson had executed a mortgage to the first International Bank, but that he had, in fact, no right to make the mortgage, and that it was of no effect. The First International Bank filed an answer, and disclaimed any interest in the land. The defendants complain at the failure of the judgment to remove this cloud from their title. No reason appears why this should not be done. This would not require a reversal; the necessary modification in the judgment could be made here.

The judgment should be further modified as hereinbefore indicated.